in the United States and around the world.    American Civil Liberties Union.   The third case we have on this morning is Castro-Reyes v. Bosque et al. Good morning. May it please the court, my name is Caria Gail Bradford and I am here on behalf of Officer Louis Serrano. There are four individually named defendants in this particular appeal and my arguments will be directed specifically to Officer Serrano. The issues on appeal with regard to Officer Serrano are whether or not his actions in repeatedly tasing Mr. Castro-Reyes constituted excessive force and, more importantly, whether Officer Serrano is entitled to qualified immunity for his actions. Serrano's the one who used the taser 22 times even after a direct order. No more taser, that's an order, right? Is this the one? Officer Serrano, Your Honor, is the officer who used the taser. He used the taser in excess of 20 times and at some point towards the end of the altercation with Mr. Castro-Reyes, somebody said to him, no more taser, Your Honor. And he violated that order? No. The problem with the taser, Your Honor, was that it wasn't working. And another individual at the scene said, no more taser, Serrano, that's not working. Okay. You know, the first issue that we have is whether or not we have jurisdiction, whether or not we have an appealable order under the collateral order doctrine for lack of appellate jurisdiction if there are genuine issues of fact. And so, we've got the district court's version of the facts are inconsistent with the officer's version of the facts. So, if we have genuine issues of fact rather than reviewing a legal order, how do we have appellate jurisdiction? Well, we have appellate jurisdiction, Your Honor, because the facts are viewed giving the plaintiff, excuse me, the appellee, the benefit of the doubt. And therefore, there's only an issue of law to be determined. Excuse me. If this were an instance where the only issues to be determined at summary judgment, let me take a step back. If this were a summary judgment situation where there were clearly disputed issues of fact, for example, Castro Reyes said, I was doing X when the officers were around me. But the fact of the matter is we have several body-worn camera videos of what happened. Mr. Castro Reyes has zero recollection of what happened that day. And none of the videos that both sides, quite frankly, are relying on are disputed. Nobody's saying... Did the plaintiff review herself and conclude that the video does not support the officer's version of the facts? Yes, Your Honor, and with the utmost respect to the district court, I just don't think that the district court got it right in light of the issues that were presented on summary judgment. We have undisputed issues of fact with regard to what happened, and then we have the qualified immunity question, which is based on the officer's perspective, what a reasonable officer should know and how he should act at the scene. So... I looked at the video. I think we probably all reviewed the video, and I can understand the officer's argument that he was violent and combative. But when you have the district judge looking at the video, I'm wondering how much deference we give the district judge's determination that what I see is different from what the officers see, and that a reasonable jury could agree with me that he was calm and restrained and nonresistant and incapable of complying with the officer's demands to roll over, and that 22 times using the taser was more than necessary, that he was struck in the face three times with such extreme force that his superior told him not to do it twice, but that command was violated and Perez was charged criminally with battery. So Judge Williams sees the video differently than what the officer sees. And if that's the case and a reasonable jury could agree with Judge Williams, I'm wondering whether or not we have appellate jurisdiction if we have an issue of fact. Well, Your Honor, I think the answer to that question is, yes, the district court judge can view things a certain way, but under the information and the facts that we have, we don't have a he said, he said situation. We do have the video, and I understand that the district court might look at it a certain way, but with the utmost respect to the district court, I just think that the district court got it wrong when looking at these genuine issues of fact, whether or not they're materially disputed. So I and I see I'm over my time, Your Honor. So if I could rest on the papers, the answer, the I'm sorry, the brief and the reply brief that were filed on behalf of Officer Serrano. Thanks very much. We'll hear from your colleague on behalf of the defendant Perez. Good morning. And may it please the court. Lord is widely on behalf of Sergio Perez. This court should reverse the district court's decision on qualified immunity and the use of excessive force as to Sergio Perez, because it ignored an undisputed salient fact. Nowhere in that 38 page omnibus order. Is there a reference to Sergio Perez's pinned hand with this handcuff? That was the only handcuff on Castro Reyes. The three distractionary strikes that were employed were in response to the pain that Sergio Perez had inflicted, was inflicted upon by the force of this subject. You can hear the video that we have is his superior says, don't do it, don't do it. And his response was, don't tell me not to do it. That's right. That he was not a superior. Lieutenant Perez was the officer in charge at that time. But the body worn camera and that's the problem. What we have is a body worn camera. But the plaintiff cannot dispute that he hurt Sergio Perez. No other officer disputed the fact that underneath that scuffle, that chaotic scene of all those officers in that wet, slippery room that Sergio Perez was injured. As a matter of fact, I would direct the court to the docket entry 105-8, which is Sergio Perez's bleeding hand, the physical evidence of an injury to an officer. It would not be appropriate. And this lower court got it patently wrong to send this case to a jury on excessive force. I thought Perez was the one that dragged him across the floor. Right, ma'am. So we do have him dragging him across the floor. And then his head hits the wall. I mean, the door frame or something. Right. And then he's dragged down the steps. Is that part right with Perez doing that? Perez removed the plaintiff appellee from this chaotic scenario. Yes, I understand that. But I'm talking about how he did it. Yes. He dragged him on the floor. He was tied up at the time, right? It's unclear if he was actually completely tied up. Well, but he wasn't. His hands weren't free. And his legs were tied up the entire time, right? His legs had wires intertwined. But his hands weren't free because he held onto the frame. And it could have been reasonable for an officer to believe. But we see him hit his head on the frame as the officer is dragging him out. I don't see that, Your Honor. Okay. But then he drags him down the steps too, right? Yes. And there are several 11th Circuit cases where officers yank out subjects out of cars, pull them out of a slippery situation. We have innocent bystanders, his own family members. I think there are cases and then there are cases. And really they all stand on their own facts here.  In the video, I'm just saying from my perspective, I'm going to have some questions for the other side because I'm not so sure that this is a false arrest or anything. I think that's a stronger appeal. But it looks to me like there was clearly a lot of force being used here to begin with before he was responding to somebody who was pretty incapacitated. That was not known to this officer and that is the examination that this court— Help me with that factually. Was your client not present at the time that the other officer tased the plane of 22 times? The other officer did not tase him 22 times. The other officer may have used his taser 22 times, but it's not clear. I don't want to quibble about how many or how well the machine worked. Was he present when that happened? Yes, Your Honor. That is to say your client?  As I understand the heart of the excessive force claim against your client is that he does two things that they claim are excessive. One, he hits him in the head three times with his fist, and then he drags him out by the ankles while his ankles are bound and his hands may be bound or not, one hand on one handcuff, one on the other. And as Judge Hull said, he takes him, drags him down the stairs and he hits his head on the concrete steps three times. That's the essence of the claim for excessive force. Why isn't there enough to take that issue to the jury? Because— Or put differently, why would you be entitled to qualified immunity on that? Because under the qualified immunity doctrine, these police officers are placed under dangerous circumstances. Yeah, but your client Paris, wasn't he charged criminally with battery? And he was acquitted. But he was charged. Yes, Your Honor. Okay. There are several cases within this court where the force has been even more egregious than what was used here. The three distractionary strikes were to free his dominant hand from the pinning of the handcuff. Those three strikes were made with his non-dominant hand, and yes, it was released. But even then, Your Honors, the situation was not under control. This plaintiff, Apelli, could not be restrained. And it was not until he was removed from the slippery wet floor and taken to the concrete that they were able to flip him and place him into custody. It took ten minutes, ten minutes to secure this individual when these backup officers arrived to— Just help me with the facts. Is he secured and in custody when the guy drags him out by his ankles? No. No. The officers are still in—they're in threat of imminent harm at that point. Well, he's not in custody. He hasn't been arrested for anything. He doesn't need to be, Your Honor. Aside from the fact that Sergio Perez is not here on appeal because summary judgment was granted as to the false arrest claim for him based on the information that was relayed to him when he arrived, it doesn't matter. At that point, he's relying on his fellow officers calling for backup, and at that point, this individual had a battery on an LEO. And he could also have been arrested reasonably for 843-01, which is resisting with violence. Your Honors, I know my time is up, but I do ask the court to look at Judge Wilson's opinion in Busey Morris v. Gomez and also Judge Marcus' opinion in Butler v. the Florida Department of Corrections where these distractionary strikes and this type of resisting subject allowed the officers qualified immunity and found that the force was reasonable. Thank you. Thank you. Mr. Raley, come right up. And you're here for Bosque, right? Yes, Your Honor. Thank you. Good morning, Your Honors, and may it please the court. John Raley, and I represent the final two appellants in this case, Sergeant Bosque and Officer Daniel Kelly. Sergeant Bosque and Officer Kelly prospectively request that this court reverse the district court's denial of qualified immunity on the count to false arrest claim asserted against them via 42 U.S.C. 1983. And why is that? That's because arguable probable cause clearly existed to temporarily detain Mr. Castro Reyes under Florida's Baker Act. We have an undisputed record here, and that's unique. As my colleagues have alluded to, the plaintiff does not recall a single thing in this case. He testified to that. Well, the Florida statute requires that the person to be Baker Acted has to be afforded an explanation, and then there's a disclosure requirement. I don't see that in the record. Your Honor, the statute actually reads with regards to subsection 2, the person has to be refused a voluntary, has to refuse a voluntary examination or is unable to make that determination for himself. Here, let's look at the undisputed record evidence. Officer Kelly and Sergeant Bosque are dispatched in emergency mode to this property. They respond to a call with an individual possibly high on drugs. They arrive, and they find family members expressing grave concern regarding Mr. Castro Reyes' mental health. His cousin is telling the officers that he's acting strange. Other family members are saying he's not his normal self. It's not their concern with his well-being. They lead the officers, my clients, into the home. There, my officers find Mr. Castro Reyes bound on the floor by his own family members and electrical wires and cords. That enough right there. It should be arguably a probable cause to detain under Baker Act, but there's more. He's partially undressed. He's laying on the floor motionless. At that point or some point, Sergeant Bosque asks Mr. Castro Reyes what his name is, and he says, I am God. Again, right there, that's enough to temporarily detain under the Baker Act. But to temporarily secure the scene and to protect officer safety, given what they witnessed in terms of the tying of the electrical cords and whatnot on three different body parts, they decided to handcuff him. And that's to protect officer safety. That's not a seizure right there, but there's more. And again, this is all on video, Your Honors, and I know you've reviewed it all. At that point, they're trying to secure him further, and they're trying to handcuff him. His cousin then puts him in a chokehold to try to control the scene. At that point, the video speaks for itself. That's the best evidence in this case. And again, all parties really do rely on the same evidence. And the undisputed evidence in this case is that arguable probable cause existed to detain him, at the very least, under Florida's Baker Act. His own behavior, the officer's personal observations, and frankly, I think the district court actually got there. On page 17 of its order, the district court writes, even so, the fact that Mr. Castro Reyes' family thought it was necessary to restrain him and that Mr. Castro Reyes was experiencing delusional ideation could be enough to demonstrate that Mr. Castro Reyes committed from the perspective of a reasonable officer. That's arguable probable cause right there, but the district court did not actually reach the conclusion. Instead, the district court reached the following conclusion. A jury will have to determine whether Castro Reyes exhibited behavior that justified Boski's conclusion that there was a substantial likelihood that without care. Can you address the question about supposed to be given an explanation and some disclosure? Is that supposed to be at the time you take him to the hospital? Is there ever any such document in this record at all at any time? No such document per se, Your Honor, but it's viewed from the point of a reasonable officer in the situation. So that's how we determine probable cause. I got that.  I'm not so much worried about whether that's arguable probable cause, but somehow the act says you're supposed to give the person who's being Baker acted an explanation. Maybe that's not in that. I thought it was in that. Subsection 2, I believe Your Honor is referring to, of 394. When is that supposed to happen? At the hospital? On the scene? I mean. On the scene. But there's a prong that reads or, and that's what's applicable to this case. Subsection 2 reads that the plaintiff here has refused a voluntary examination or is unable to make that decision for himself. Here, based on the information and the observation. You're saying they weren't trying to give him an option here because he was unable to make the determination. Am I correct that the medical people, the fire and rescue, took him to the hospital? That's correct. They didn't transport him? The officers did not transport him? The officers didn't transport him. The fire and rescue took him. That's correct, Your Honor. Okay. He had family members there. Was there anything in the record reflecting that before he was Baker acted, if he was incapable of responding to the questions that the family members could have said, yeah, we want him Baker acted or no, we don't? That's not a determination for the family members, Your Honor. But there is a plethora of evidence in the record regarding his unstable mental behavior. He had moved all of his furniture out from his apartment. He had told his neighbors who were his family members that he wanted to cleanse his life. He was acting strangely and bizarrely. Let me ask you, how much of this was known to the two arresting officers who Baker acted him? What, in essence, did they know? Yes, Judge Marcus, I can break that up into two parts. So the first part is the responding officers on scene. They arrive. They are greeted by a family member who said he's mentally unstable or he's acting strange. They're concerned. They knew they were being dispatched to a male, possibly high on some type of superpower drug. They show up. They see him tied up and bound. Did the officers know that the aunt and the cousin tried to block him from leaving? They blocked the door when he tried to go out because they thought he was a danger to himself? At the time they arrived, no idea. But during the course of this series of events over the few minutes it took them to try to restrain him, et cetera. No, Your Honor. Did they tell the officers that or was that a fact they did not know? I don't believe there's any record evidence that they knew that fact at the time. But what they did know is that the individual was tied up and he said he was God. And that's at that point they knew. And they knew that he had thrown his furniture outside, right? Or did they not know that? I don't believe they knew that at the time either, Your Honor. But there's later on as the videos show, there's multiple conversations between family members and officers explaining all this and then the testimony in this case also is replete with that type of evidence. So that's knowledge you can impute to these officers objectively to support arguable probable cause? The knowledge of the information. That's what I'm asking, yes. Yes, Your Honor. I'm asking whether this was information that the arresting officers knew at the time they Baker acted him. They detained him. They attempted to restrain him. They Baker acted him. They tased him. They dragged him out, and then he was taken to the hospital. That's what happened. But the arresting officers, your clients. Yes. I'm trying to find out what is it that they knew when they made the determination, A, to restrain him, and B, to arrest him for Baker act? What they affirmatively knew was that they arrived on scene to family members telling them that he's mentally not unwell. He's acting strange. They're worried about his behavior. They walk inside. They see him already tied up by his own family members with electrical wire and cords on his ankles, his legs, and his hands. And then he says he's God. That enough right there is enough to detain under Florida's public, I'm sorry, Florida's. Do we know what the officers who were dispatched, what the dispatcher said? I thought we knew the dispatcher said something. There's a dispute as to whether the dispatcher said there was a violent male or not. So even without that, it's undisputed that they were dispatched in response to an individual. They were dispatched in emergency mode in response to an individual possibly high on drugs. Does this record reflect the 911 call, that is to say the tape itself? I believe that isn't part of the record. It is part of the record. I believe it was submitted as part of the materials. So that's the family calling the police, though? Yes. Okay. They say when one of the officers gets there, he says this is a 52. Is that the drug part? What is a 52? The officer said this is a 43, and that's a Baker Act. That was Sergeant Bosque, Michael. I know, but at some point, somebody says he's a 52 as well. I'm not. You don't know what that is? I'm not familiar with that part of the record. No further questions. I thank you for your time. Thank you. And for Appellee, Mr. Davis, and good morning. Good morning, Your Honor. Good morning, and may it please the Court, Michael Davis, Ben Cuney, and Johan DeSantis here on behalf of the appellee, Mr. Castro-Reyes. There are really two issues before the Court, and I really want to start with the threshold question, which is, is there appellate jurisdiction? As Judge Wilson noted, qualified immunity appeals, interlocutory appeals, are not automatic. There is no statutory right to immediate review of an order denying summary judgment simply because qualified immunity was raised. Under Cohen, Johnson, and Johnson, in order for there to be appellate jurisdiction, immediate appellate jurisdiction, the issue on appeal must be a question of law. Simply challenging the district court's findings as to the sufficiency of the evidence that may or may not be proven at trial is not enough to give this court immediate appellate jurisdiction to review an order denying summary judgment. And as the Court saw from all of the arguments that were raised here today, the core issues that are raised on appeal is the district court's conclusion that there is sufficient evidence as to what may or may not have occurred. Well, don't we know what occurred? The video tells us what occurred. This is basically an undisputed facts case. You look at the video. With respect, Your Honor, an English v. City of Gainesville, 2023 case. I'm not asking about what case you might talk about. I'm talking about we have a video here, right? Yes, Your Honor. Everything's a video, and it's audio, right? There is audio. Some of it's in Spanish, and not all of it is clear. I mean, all of it's just not. You can't hear everything that's going on.  Your Honor? Do you have a transcript of the audio? Yes, there is a dirty transcript. There is a transcript that was attached to the appeal. It's at PDF. It isn't really the fact here we take the video in the light most favorable to the plaintiff. There may be some ambiguity in the video, but we review, just like we would any facts, we review this video in the light most favorable to the plaintiff, and then there's a question of law as to whether or not they're entitled to qualified immunity. This isn't really a case where we've got somebody says this, somebody says that, and we've got all these facts. I know what Judge William has to say. I mean, I've read her order. I have it right here. She basically does what the counsel says. She acknowledges all the facts, and she says, Well, they had all this information about Baker Act. I think that's a jury issue whether it was enough. That's not really what we do here, and I'm asking you why am I wrong about this. We have the video. We have all the evidence. We review it in your favor, in the light most favorable to you, and then we say as a matter of law, do you have an arguable probable cause? So with respect to So why is that not the question here? Well, you understood that. With respect to the Baker Act issue, I understand the court's point, but there's also the second issue, which is I'm not worried about the same thing would be excessive force. We look at all this, and the light most favorable to you is what they're doing excessive, and I think the video, I'm just speaking for myself, looks pretty excessive, so I'm not worried about that part, but it's not a fact issue. Look what they did, and is that excessive force? Your Honor, in English v. City of Gainesville, the court was confronted with a similar order where the court basically looked at the body camera footage, and in that case, the court concluded that the video leaves it up for interpretation as to what actually happened, and in that case, this court concluded that there was not, in fact, appellate jurisdiction, and in that case, the district court determined, like here, that viewing the evidence and the videos in the light most favorable to the plaintiffs, a reasonable jury could find that the officer's use of force was unreasonable. That was an excessive force case. In that context, where the only dispute was— Did they dismiss it for lack of jurisdiction? Yes, Your Honor. Okay. Yes, Your Honor. And did they have a false arrest claim there? No, Your Honor, that was an excessive force case. Okay, that's an excessive force case. But the point is that it's the video footage. Is that case cited in your brief? Yes, Your Honor. Okay. Yes, Your Honor. And we also cited White v. Mesa as well as Gordon v. Chattatooga, which are panels that Judge Marcus and Judge Wilson sat on, but the court also dismissed— But that would mean there would never be jurisdiction of a qualified immunity because you'd take the facts and the life's most favorable and say they could always present—we'd never get to qualified immunity because they're always disputed facts. Respectfully, no, Your Honor. So if this were an appeal where they adopted the court's findings of fact and they did an appeal based off of that, that would be different. So let's say, for example, consider Serrano's case, right? The court disputed facts or was Mr. Castro Reyes violent and noncombative as they've alleged in their affidavits? The district court concluded looking at the video or jury could find that he was not being violent. If they were appealing the question of whether the use of 22 tasers on a nonviolent, largely compliant person, then the court would have jurisdiction. Instead, what they have argued and the approach that they have taken is that the court should disregard the facts that the district court found to be sufficient, use its own version of facts— District court, in this summary, Judge, I mean, qualified immunity, right? The district court doesn't find facts. They review the facts and the like most favorable to the plaintiff. Yes, Your Honor. You don't claim the district court found facts here. You must contend they reviewed them and the like most favorable to you, correct? Exactly, Your Honor. Okay, the district court didn't have a hearing and find facts. No, Your Honor. They just reviewed them and the like most favorable to the plaintiff. Yes, Your Honor. Okay. I can move to the merits. Yes, I would ask you to move directly to the merits. Let's assume we have jurisdiction over this interlocutory appeal. Tell me why the arresting officers did not have probable, arguable probable cause to Baker Act your client. Yes, Your Honor. I think, Judge Marcus, the court began to sort of ask the right questions. So when the court looks at the video, we're talking about a matter of less than 10 seconds of observation, and that body camera footage does record what they knew. This is what they knew. When Officer Bosk arrived, he met Mr. Cacereas, his cousin, who really identified four facts. One, that Mr. Cacereas had been trashing his apartment. Two, that he at some point said he was God. Three, that he'd never been like this before, meaning there was no reason to believe that he had mental or a history of mental illness. And four, that they had tied him up. As the court noted from the argument presented by opposing counsel, what Officer Bosk was not told was that Mr. Cacereas had posed a risk of harm to himself or others or that he had threatened violence. And, in fact, in deposition – Let me ask you the question this way. We know on the front end the exact language. Varela said on the front end to the officer, I got this cousin right. One, we had to tie him up. Two, he started to trash the whole apartment, and my brother called me about what was happening to him, and we don't know. We had to, then it's inaudible. He started to say God, that he is God. The cops then go in. They find your client on the floor. The floor is wet. The plaintiff is lying on his back. His pants are taken down to his ankles. That's the condition they find the plaintiff in. His ankles are bound up with cord, electric cord, that they obviously found in the apartment. They try to tie up his arms using shoelace or some other string of some kind. They know that he's crying inside. At one point they ask him who he is. He says he's God. And in the course of it, they determine that he should be bakeracted. Why is there not arguable probable cause under these circumstances to bakeract him? Why couldn't they reasonably believe, based on the information they had, that he should be involuntarily bakeracted? Your Honor, there are three, well, there's one reason, but it's because there's three elements to the Florida Baker Act. The first requirement is that the person have a mental illness, and the court is correct. All of the facts that the court has identified could lead a reasonable officer to conclude that there is a mental illness. The issue in this case, Your Honor, is this other two elements under the Florida Baker Act that must be established. That's what this court addressed in Quarry. That's what the Second District Court addressed in KM. What are the two elements? Yes, Your Honor, the two elements are, one, as Judge Wilson noted, the person has to be asked to voluntarily submit himself and refuse to do so. So you propose under these circumstances, when he's on the ground insisting he's God and he tells the police officers, don't touch me, leave me alone, get out of my apartment, they were supposed to then give him some kind of warning about the Baker Act? Well, Your Honor, if I may just push back real respectfully in terms of the facts, right? At the point where they order the seizure, he's not yet said he's God. When the officer comes in for those seven seconds, the only thing that Mr. Castore said is you don't have permission to be here. Officer Boss then says, tie him up. What the court should not do and what the courts have held is that you cannot refer to conduct that occurs after to determine whether there is a probable cause to initiate the Baker Act itself. But moving to the third element, the third requirement, which I think is the hardest element for them to reach is this requirement that one, because of that mental illness, there is a substantial likelihood that without care or treatment, the person will cause great... I'm sorry, cause serious bodily harm to himself or others in the near future. Okay, let's go to element two. That is, the person has refused examination after an explanation and disclosure, but it has an or, or. The person is unable to determine for himself whether examination is necessary. You'd have to admit there's at least enough facts on that prong that they could have gone under the or rather than trying to interrogate him. They could have looked at the scene and say he's unable to decide for himself. That's kind of the mental illness part. I mean, do you really dispute that? You claim he was able to decide for himself whether he needed to go to the hospital? Your Honor, I agree that our strongest argument is point three. So let's go to it. Thank you, Your Honor. So let's go to point three. Point three is whether there is reason to believe that the person will cause serious bodily harm to himself or others. And as Judge Marcus noted in questioning of counsel for the appellant, at no point was the officer informed of any information that suggested that there was a substantial risk that he would cause serious bodily harm to himself or others. Let me ask you a question about that, Mr. Davis. What is a reasonable officer supposed to assume when he sees the guy tied up and he's told by the cousin that the cousin and the aunt actually tied up the nephew and the cousin with whatever they could find at the moment, which was some electrical cords and some shoelace? What inference would a police officer reasonably be permitted to infer from the fact that his own family felt compelled to tie him up and put him on the ground and take his pants down to his ankles to try and immobilize him so he could not leave or do something? Couldn't they reasonably infer from those circumstances alone that at least his relatives thought he was a serious and substantial risk to himself or to others? Well, so that would mean suicidal. And, Your Honor, to the extent that they... Well, no, I didn't limit it to a serious risk to himself. I said a serious risk to himself or to others. Yes, Your Honor, but I asked the court to consider his cousin's testimony in deposition, where he confirmed in deposition that he never told the officers that Castor Reyes was a danger to himself or others. That's not what he's asking you about. I've done this 30 years. I've never had a family member tie people up, okay, other than they're afraid they're going to hurt them. I mean, what is the obvious inference from the family member? These seem like nice people. They were trying to protect him from harming himself. I mean, it's just patently clear that that's a reasonable inference. It may not be the only inference, but why is that not a reasonable inference? Your Honor, we've just asked that they follow the statute. No, no, that's what... But go back to why is that not a reasonable inference, a reasonable police officer in the scene? You come in... I mean, it was actually pretty amazing that they were able, one, to do it, and, two, that they went to that extreme to keep him from hurting himself. Your Honor, we would ask the court to look at KMV State. In KMV State... I'm going to look at the facts here. There's no case that's anything like this. There's no case. You can never cite me a case. I mean, I've never seen one. Well, I'll just say, in KMV State, the police were confronted with text messages that were arguably suicidal. They were very concerned about the text messages, so much so that they used technology to identify where this person was, and they tracked him down, and they immediately took him into custody, and under those circumstances, the Second District Court of Appeals concluded... Let me ask you this. Suppose these officers hadn't had Fire and Rescue come and send him to the hospital. Suppose they left him there. Okay, there's nothing there, and then he hurts himself. You know what kind of lawsuit you're going to have? You're going to have a different lawsuit. Are you not going to have a different lawsuit if they don't take him? I'm sure there'd be an attempt, Your Honor. I'm sure there's an attempt. Which way you want it. Take him, and you have a lawsuit. Don't take him, and you're going to have a lawsuit if he hurts himself. Yes, Your Honor, if I can just say this way, and I really want to make sure that I get... I see that my time is about to expire. No, you take your time, and you answer the question. Thank you, Your Honor. I'd ask the court to really think of it this way. I do need another way to think of it. Yes, Your Honor. We're not contending that there may not have been facts that would have developed that could have led the officers to have reasonable grounds to believe that there was a substantial risk that he was going to harm himself or others. The issue in this case is that they were only there for seven seconds. Only a seven-second observation. If they had just asked a question, he was tied up,  This is not a circumstance where the police arrive, and the person is running around, flailing, or with a knife in their hands, or engaged in something active. Here, they came into the house, as the video showed, and as we put the video, or the picture, in our briefs, he's just there, tied up. The officers had the opportunity and the time to find out what was actually going on. And it's very true. It is very true that there are some reasonable inferences that could have been made, but under the circumstances of this case, the district court correctly concluded that a reasonable jury, looking at the video, given the fact that they're just there, the officers asked no questions. He's not doing anything to actively suggest he is a harm. Maybe he was a harm in the past, but as of now, when they see, they don't see that he's a harm. They see some gentleman who has been tied up by his family. Understand what we're looking at for arguable, arguable probable cause. The standard is more lenient than actual probable cause. The officer is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed. That's the test for arguable probable cause. And so the essence of the question is, couldn't they reasonably have believed, even if they were wrong? Yes, Your Honor. If I can, in my last 10 seconds, if I just sort of move to the excessive force issue. I'm going to give you a chance to address that. I'd like you to answer my question. Yes, Your Honor. The standard for the court is correct. Did I have the standard wrong? No, Your Honor. So tell me specifically why a reasonable officer could not have believed that your client posed a danger, a real and substantial danger to himself when he was tied up, bound, put on the floor by his own aunt and his cousin. Your Honor, the standard is if he's not given treatment or care, there is a substantial risk that he'll do it in the future. And I think the issue here, Your Honor, is that he was already bound, he's already tied up, and they have no facts about what's going on. They really don't know. They had no information other than the fact that he was bound up. Let me ask the question this way, and Judge Hall sort of alluded to it in her question. If the cops couldn't detain him and bakeract him for arguable probable cause, what is it, do you suppose, that Perez, not Perez, Bosque and Kelly should have done when they walked into that house? What would have been proper police conduct? Should they have looked and said he's partially incapacitated by his family, he says he's God, he's tossed his furniture out. Should they have just left? No, respectfully, no, Your Honor. What should they have done? The standard procedure would have been to talk to the family for more than seven seconds, find out what's actually going on. They knew what was going on because Varela told them on the front end before they walked in. Well, yes, Your Honor, but in terms of finding out what's going on with his mental state, they find out what's going on. By the way, did they see that he was crying when they walked in? Wasn't there evidence that right off the bat he was crying? No, Your Honor. From my recollection, the body camera footage, he was just laying there calmly as the district court noted. I think that's why the district court concluded there were factual issues because when the police arrived, he's just sitting there tied up by his family. Okay, they should have spoken further to the aunt and the cousin. The aunt and the cousin already said we tied him up, he tossed the stuff out. They were obviously worried about him. What more would they have had to say that would have given them leave to Baker Act? I think what they ultimately learned, Your Honor, is that he was not being violent or aggressive. If the court watched the body camera footage as it goes along, the family explains to the police that Mr. Casares is not an aggressive person. I think ultimately when they interviewed him, and even in their depositions, they noted that he was not Why tie him up in the first place if there's no risk of danger, violence, or something? Well, so they said that he was trying to leave and they didn't want him to leave. Why? Your Honor, the record is silent as to that question. I don't think that question was Wasn't there evidence, albeit later, that they were fearful that he would harm himself if he left? Respectfully, Your Honor, I've not seen that anywhere in the record and I'll leave it to my colleagues to show that but that's not in the record. Let me ask you about when he gets to the hospital. I understand we don't have hospital records but my understanding is when you go to the hospital I understand we don't have records but we just know he stayed there from September 21 to September 25. He stayed overnight four days at the hospital, right? Respectfully, no, Your Honor. How long did he stay? He stayed 48 hours but I think the issue is that he was not Baker Act. There are no Baker Act reports. But you get to the hospital and I thought that we knew that the hospital doctor at least evaluated him and kept him overnight. Your Honor, that's not my understanding. He was actually handcuffed to the bed, which would not be standard Baker Act procedure. He sat in the hospital under arrest. There are no Baker Act reports. We know how long in this record he was kept in the hospital. More than 72 hours, Your Honor. I believe it was three or four days. So there are no Baker Act reports. He went in on the 21st, got out the 25th. Okay, so we don't know anything about that. So we got to look at what happened only at the scene. I didn't know if there was something later on we needed to look at. Which I think is an additional fact, right? Because he wasn't actually Baker Act. They didn't fill out any Baker. It's under floral law. When a person is Baker Act, you fill out a report about what happened so the person could be evaluated. So why don't you take a moment and just turn to the other issue so they can respond. Thank you, Your Honor. I'll give you one minute to do it. So if I could just talk about the excessive force. Yes, Your Honor. I think there are three core factual disputes, and I'll just run through them right quickly. Three core factual disputes that the District Court identified and that we believe this court should rely on. The first concerns, one, was Castor Reyes engaged in violent resistance or tensing and bracing? You have the officer's affidavits that say that he was violently combative. On the other hand, you have the body camera footage. You have Sergeant Bosk who testified that Mr. Castor never kicked or punched anyone. You have Sergeant, I'm sorry, you have his cousin, Mr. Valera, who says that he was never violent. You also have Officer Perez who testified that Mr. Castor Reyes never kicked or punched the officer. So you have the testimony of three plus the video on one side saying that he was never violent. Then on the other hand, you have the affidavits from the officers and some of the reports that say that he was being violent. The second dispute issue of fact is what did Serrano and Perez know when they arrived? As the court saw from the oral argument, their position is that they did not know necessarily what was going on. But the body camera footage shows that when they arrived, they asked who's the subject and then they were informed by Sergeant Bosk that he was a 43 mentally ill person. And it is our view, Your Honor, that if the jury finds in our favor on those two facts, then that renders this case materially indistinguishable from Boynton. There's a third also dispute of fact as well with respect to Perez. And that concerns why did Mr. Perez strike Castor Reyes in the face? As Judge Wilson noted, the body camera footage, when he strikes in the face and he's told by Officer Bosk to not do it, he does not say that I'm trying to free my hand. Rather he said he's resisting. So you have what he actually said on the day in question versus the explanation that he gave once this is over when he claimed that his hands are free. In our brief, we tried to include those clips of what happened just before and we identified where his hands were. And when you look at the body camera footage, Mr. Perez's hands are not underneath Mr. Castor Reyes. The body camera footage does not support that. Was there any statement where somebody said he's a 52? Am I just wrong about that? What? That he's a 52, whatever that means. I know they said he's a 43, but sometime during the altercation of the excessive force, somebody says he's a 52. Is that wrong? You don't know anything? Yes, I have no recollection, but in my experience when an appellate judge recalls something, I just tend to... Did all these questions we're asking be asked of the witnesses at the trial? Yes, Your Honor, including what information. And there's a final piece too for Perez. There are three additional facts. I think, Judge, there's really one additional fact. With Perez too, you also have Sergeant Bosk who told him don't do it. You have the FDLE who reviewed the information and determined that striking Mr. Castor Reyes in the head three times in the head against his will and against a person who's only passively resisting, they concluded that that warranted criminal charges. And then finally, Serrano who testified in a deposition that he would agree that he would agree that that amount of force by Perez was unreasonable. I think you fully expressed your views on it, Counsel. We thank you for your efforts. Thank you, Your Honor. The appellants have each reserved one minute apiece. On behalf of Officer Serrano, very briefly, Mr. Castor Reyes's counsel would have the facts portrayed as Mr. Castor Reyes just innocently tied up in this room. The fact of the matter is that Castor Reyes was actively resisting, which he concedes in his response to the summary judgment motions. The fact that he didn't land a punch or a kick doesn't take away from the fact that he was actively resisting. In fact, when Officer Serrano came into the apartment, he didn't know who the suspect was because Mr. Castor Reyes's cousin had him in a choke hold and had him down. And I believe choke hold is the word that was used in the District Court's summary judgment order. That gives probable cause to all the officers for resisting and gives all the officers probable cause to use reasonable force to take Mr. Castor Reyes into custody. With regard to taser use, regardless of the number of times of taser use, Officer Serrano was not on notice that a repeat taser use would be unconstitutional. This is not a Draper case, and quite frankly, Draper is the ideal case where you have resistance, one tasing, and compliance. This is a case much more like Hoyt, in which the subject was tased 18 times, which is much closer to 20 than it is to 1. In Hoyt, the individual was screaming that demons were trying to kill him. He rushed an officer. Two officers attempted to continually handcuff him, and Mr. Hoyt refused to comply with the officer's instructions. He'd put one hand behind his back but not the other, or keep his arms outstretched, and he would ignore law enforcement officer commands. It turns out that Hoyt was much of a melee, like the Castor Reyes situation, with folks rolling around on their knees trying to get an individual handcuffed. For those reasons, we would ask that the District Court's order denying summary judgment to Officer Serrano be reversed and that he be given qualified immunity. Thank you, Counsel. Thank you. Briefly, before I address the merits on this is immunity, mixed question of law. In fact, this Court may make its own independent analysis. This is not a case of police brutality. This was not a beating of this individual. Do we know from the record, I mean, they went in and in seven seconds decided to handcuff him. Do we know if he hadn't been committed any crime? Do we know why they needed to handcuff him? Why was there a need to turn him around, to handcuff him, if he was already tied and bound? Do we know from the record why? That may be a question better suited for Bosk, who arrived on Bosk's counsel, who arrived on scene. For Sergio Perez, who was a responding third backup officer, he was told that this individual was overpowering, was overpowering the two officers that were already on scene. And he heard commands, and we know based on all of the 11th Circuit case law, turn around, give me your hands. None of that was being, none of that was being followed. Virate, which is turn around in Spanish. None of that was being followed. Help me factually counsel, when did they actually handcuff him? Succeed in cuffing him both hands behind his back? It was only until Sergio Perez had removed him from those close, wet quarters. So he was outside. He is outside. That's after he drags him out, he drags the plaintiff outside. After he removed him from that chaotic scene, he was able to be handcuffed. Before that, like all of the 11th Circuit's precedent, he is never restrained and in control by the police officers. They tried to handcuff him when they first went in, before they dragged him outside. They only had one handcuff, which we know from other cases, that one handcuff with another handcuff could be swinging around, and that's a danger. To boil it down, in its essence, they tried to cuff him inside, they cuffed him on each hand, but they didn't cuff both hands together. There was a handcuff on one hand held by one cop. Did they get the handcuff on the other hand? No, Your Honor. They did not. He was never in control and custody of the police. I didn't ask about control, I'm just asking a very surgically specific question. Was he fully cuffed in the house? No. He was fully cuffed only after he was taken outside.  That's why the court's order below is wrong when Kathleen Williams, Judge Williams, says that the force used was unprovoked. None of these officers had control and were able to restrain Mr. Castro Reyes prior to taking him outside, prior to being removed by Sergio Perez from those wet, slippery quarters, and Your Honor... I think you'll have to bring it to a head counsel. You're a little substantially over your time. I understand, and I thank the court for its time. We rest on our papers. Thanks much. Judge Wilson, I can answer your question as it's probably best tailored to Sergeant Bosque. Upon arrival, again, as I mentioned earlier, they found Mr. Castro Reyes bound and tied up by his own family members with electrical wires that were presumably located within the house. That's what the family members told the arriving officers. In order to better protect officer safety and the safety of Mr. Castro Reyes himself, Sergeant Bosque made the decision, let's put handcuffs on him. So when the officers went in, he was a threat to the safety of the officers? The officers didn't know at that time. You have to look at it from the viewpoint of a reasonable officer. They're being told that he's... They seem tied up, being told that he's not mentally stable by his own family members. There was no contemplation of any crime that he had committed, right? Not at that point. And there doesn't need to be. Yeah, but those are some of the factors that we take into consideration in determining whether or not there's excessive force, the safety of the officers, whether he's committed a crime, whether he's a threat to others or himself. That's correct, but my issue, solely related to my clients, is detainment for the probable cause purposes. And as my opponent, I believe, conceded at this point, there were multiple factors that led into the decision to place this individual under, we'll call it, detainment under Florida's Baker Act, and those being the information learned and observed on the scene. So unless there's any further questions, we'd ask for reversal. Thank you very much, and thank you to all of counsel for your efforts in this case. We will be in recess until 9 a.m. tomorrow.